**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-CR-20018-KMW**

**UNITED STATES OF AMERICA,**

        Plaintiff,

vs.

**TENZIN ORGIL,**

        Defendant.

_____/

## SENTENCING MEMORANDUM INCLUDING MOTION FOR DOWNWARD VARIANCE AND DOWNWARD DEPARTURE

Defendant TENZIN D. ORGIL (hereafter "Tenzin" or "Orgil") is to be sentenced after entering a plea of guilty to Count 1 of the Indictment: Conspiracy to Distribute Fentanyl, in violation of Title 21, United States Code, Section 846; Count 3 of the Indictment: Conspiracy to Distribute 50 grams or more of Methamphetamine, in violation of Title 21, United States Code, Section 846; and, Count 5 of the Indictment: Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956. On July 24th, 2023, this Honorable Court ratified Mr. Orgil's plea agreement with the United States wherein he made a heartfelt, and unequivocal statement taking full responsibility for his actions. Orgil's plea was early (only 3 months after retaining the undersigned) and saved the United States and the judiciary countless resources by accepting responsibility so quickly. Now this Honorable Court is charged with the solemn and unenviable duty of deciding a sentence for Tenzin that will account for the nature and severity of his crime but will also take into account the man that Tenzin is.

As the Court is aware, the Supreme Court, in *United States v. Booker*, 125 S. Ct. 738 (2005), modified 18 U.S.C. § 3553 (b) (1), the provision of the federal sentencing statute that made the Sentencing Guidelines mandatory. It severed and excised 18 U.S.C. § 3553 (b) (1) from the Sentencing Reform Act of 1984 and in doing so, effectively made the Guidelines advisory. This modification still requires a sentencing court to consider the Sentencing Guideline ranges but also allows the sentencing court to tailor the sentence in light of other statutory concerns, pursuant to 18 U.S.C. § 3553 (a). Congress has instructed sentencing courts to "impose a sentence sufficient, but not greater than necessary, to achieve the purposes of sentencing (punishment, deterrence, incapacitation, and rehabilitation). 18 U.S.C. § 3553(a).

Thus Orgil, through this sentencing memorandum, will ask this Honorable Court to determine a fair and just sentence; one that takes into account the crime he committed and the man he was and the man he is today as well as the severity and impact of his crime. Orgil will be the first to tell this Honorable Court that his acts were wrong and significant in impact. Orgil will tell this Honorable Court that he makes no excuses for what he did. Orgil will tell this Honorable Court just how terribly he feels for committing this crime and how it has affected his family. Lastly, Orgil will explain how his life turned from a bright, complicated child of Mongolian immigrants to fast paced life of drugs and money. While Tenzin and Tenzin alone takes responsibility for his crimes, this Honorable Court can and should recognize that many factors contributed to bringing Mr. Orgil before this Honorable Court in the instant matter.

Mr. Orgil is aware that 18 U.S.C. § 3553 (a) also factors the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. In that respect, Orgil truly regrets and laments involving himself in this crime. He whole heartedly is aware of the seriousness of this crime and understands that he

must be punished accordingly.

Mr. Orgil stands before this Honorable Court, having taken full responsibility for his crime, and asks this Honorable Court to now consider the man Tenzin D. Orgil is. The crime has been charged, convicted, and adjudicated. Orgil owned up to his crimes and has assisted in his own prosecution. Orgil is a convicted felon now with a lifelong "Scarlet Letter" upon his chest. Once the pride of his family, Tenzin has brought great shame to his loved ones, particularly his mother and father who came to our great country with the hopes that their son would have a better life than they did. Tenzin has a 2 year old son named Zaya. Zaya is the pride of Tenzin's life. Tenzin failed his son and his family by committing to a life of crime. He is deeply embarrassed and ashamed and regretful that his selfish actions have led to him not being able to hold his son and grow with him. Tenzin's parents did their best to raise Tenzin in the strong Buddhist tradition. Tenzin was the Buddhist equivalent of an alter boy. He grew up in the temples and would always be the one to assist. Even as he got older, Tenzin always found time to be a part of the Buddhist community and would mentor young people and help with the prayer ceremonies. Tenzin has always suffered from a lifelong mental illness and various autism-spectrum disorders. He has been diagnosed by many professionals (attached) as having Autism Spectrum Disorder, Major Depressive Disorder, and Posttraumatic Stress Disorder. Tenzin has suffered from extreme bullying as a child which lead to many physical altercations often requiring hospitalization (attached). Dr. Patsy Mok Tsang found that Tenzin needed "high level(s) of supervision and monitoring[1]" something he simply couldn't get from his round-the-clock working immigrant parents with their old-world parenting styles when it came to mental health or "feelings." He was often babysat by others in the community and would associate with the children of the other

---

[1] Dr. Mok Tsang's attached mental health evaluation

families. Mongolian culture in California is very closed off from the rest of the world. Residents of the Asian neighborhoods often go all day without having the need to speak English or interact with anyone who isn't of their heritage, much like someone living in Hialeah, Florida might experience. The culture is heavily elder-dominated with respect for elders being a highly regarding virtue. Further, according to Orgil's family, the neighborhood in which Tenzin grew up is not a wealthy area and the wealthy residents are often involved in illegal activity. Even though they are criminals, these older, wealthier folks are revered and respected because they give back to the community or contribute to prayer services. Young, depressed, autistic Tenzin considered his parents "suckers" for spending their days working for low wages when the real power, money, and respect came to those who didn't seem to work at all. He found a comfort in criminal enterprise and he found protection and legitimation in his fellow criminals. Interestingly, the tattoos that almost completely cover Tenzin's body were all done in a matter of weeks very recently before his arrest. Life with his new friends weren't easy and this naturally soft-spoke and shy boy was not facing all types of new artificial enemies; people who hated him simply because of the company he kept. As an adult, Tenzin has been involved in multiple life-threatening attacks requiring surgeries, long hospital stays, and difficult recovery. Some relevant medical documents are provided. Tenzin's mother will tell this Honorable Court that 'Ten' has always been a gentle soul who desperately craved the attention and approval of those he looked up to. Once this admiration and desire to emulate shifted focus from his wonderful parents to drug and gang culture, Tenzin was doomed. Given Tenzin's diagnosis, it is no wonder why he excelled in his criminal enterprise. A hyper-fixation on a task paired with the desire to make others happy was a recipe for disaster. Tenzin will be the first to blame himself and not others for his criminal conduct and he will acknowledge that he benefited financially and enjoyed the benefits of his illicit activity.

Accordingly, Tenzin has agreed to an extraordinary amount in forfeiture and has not contested any of the "luxury" items that were seized. At this tender age, one grows and matures by leaps and bounds weekly. Tenzin has been relearning his coping skills to focus on the things that really matter in life: family, education, love. Tenzin is an avid reader in jail where he is constantly consuming books or media related to science. He spends much of his time trying to plan out the future for his son and protect him against the mistakes he made himself. Tenzin often talks about how he wants to get "back to basics" with his family now that his life is not controlled by the gang. He looks forward to spending time with his son and his fiancé. Tenzin often speaks about the importance he now recognizes in making sure the future generation of his family has the tools they need and don't fall through the crack as to become susceptible to horrific influencers. Unfortunately, this new generation this Honorable Court is seeing is so obsessed with covering gaping emotional wounds with short-lived money or influence. Tenzin is lucky that he recognized it before he was killed. The Pre-sentencing Report furnished by the Office of Probation does a fantastic job of laying out the various hardships Orgil dealt with growing up and describes which ones he overcame and which ones he didn't. Tenzin's family has provided this Honorable Court with letters from clergy, family, friends, and community leaders describing the man Tenzin is. Orgil respectfully asks that this Honorable Court read these letters critically so as to see how and when the "shift" happened from young, sweet, docile assistant monk to the convicted drug dealer awaiting his sentence.

## Sentencing Factors

The Court is familiar with the broad judicial discretion provided to the sentencing judge in *United States v. Booker*, 543 U.S. 220 (2005). Following *Booker*, sentencing courts are not required to impose a sentence within the Guidelines range. Instead, the Court should determine a reasonable sentence under a two-step process. *Gall v. United States*, 552 U.S. 38, 49 (2007). First, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Id. (citing *Rita v. United States*, 551 U.S. 338, 347–48 (2007)). Next, the Court must give "both parties an opportunity to argue for whatever sentence they deem appropriate" and "consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." Id. at 49–50.

In doing so, the Court "may not presume that the Guidelines range is reasonable." Id. In fact, sentencing judges may "place greater reliance" on the section 3553 factors than the Guidelines, particularly in the context of financial fraud cases. See, e.g., *United States v. Adelson*, 441 F. Supp. 2d 506, 509, 515 (S.D.N.Y. 2006) (noting "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss."). The same should be applied to drug cases and quantities exploding guidelines.

Thus, although the Guidelines are "the starting point and the initial benchmark," the Court's sentencing inquiry must focus on the section 3553(a) factors and must be grounded in an "individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49–50.
Congress has further instructed that the Court should recognize "that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582. With that in mind, and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes of [sentencing]." 18 U.S.C.

§ 3553(a) (emphasis added). As detailed below, 90 month sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing in this case.

**Application for "Safety Valve" under 18 U.S.C. § 3553(f)**

In their pre-sentencing report, the Office of Probation indicates that Orgil's total offense level is 43. Orgil agreed in his plea agreement to various enhancements that put him at a level 43 which would give this Honorable Court advice to sentence Orgil to life in prison. Included in that statutory provision for sentencing is a 10 year mandatory minimum term of imprisonment under 21 U.S.C. § 841(b)(1)(A)(viii). Probation and the United States contend that Orgil is ineligible for "Safety Valve" relief as to this sentence because a firearm was found in the home of the defendant. According to law enforcement, when executing a search warrant at Orgil's home in California, a Glock pistol was found in the kitchen. The home was shared with his fiancé Ms. Hoang. Ms. Hoang is currently serving a sentence for assault with a deadly weapon, an offense for which conduct stems from before the search and seizure of the Glock 19. The weapon, a Glock 19, is a small framed pistol meant for concealed carry or those with smaller hands, or women. Glock's own webpage for their 19 model prominently features a photograph of a woman holding the gun at a target range [2]. Additionally, many gun review websites praise the Glock model 19 as a "Great Gun for Women[3]." Orgil stands at over six feet tall and is large framed and muscular. His hands are larger than the average male hand [4]. A Glock 19 Sub-Compact firearm would be extremely small in Orgil's large hands and would not make a good fit for comfort, accuracy, and safety. Orgil never gave a statement claiming the gun as his and denies that the gun belonged to him. Further,

---

[2] https://us.glock.com/en/pistols/g19
[3] https://thewellarmedwoman.com/about-guns/glock-19-gun-review-womans-perspective/
[4] Undersigned's opinion

California does have a gun registry (unlike Florida) and finding the rightful "registered" owner should have been easy for law enforcement but that was never done to the knowledge of the undersigned. The weapon was not found on Mr. Orgil's person and the firearm was not found in connection with the offense. The firearm was found in the kitchen of a home that doesn't look like a drug den but, rather, a slightly messy townhouse belonging to a young family with an infant. Mr. Orgil's offense involved mailing drugs to different cities in the United States. A defendant is otherwise ineligible for Safety Valve when the weapon was found in connection with the illegal activity. Safety Valve was not meant to protect the violent street drug dealers who use violence as a means to regulate their illicit business. The firearm ineligibility is meant for those who use the firearm as a means to protect their illegal activities and to possibly hurt those who threaten the stability of same. The most common scenario of ineligibility is when a defendant is found to be in possession of large amounts of drugs and a firearm in his car or his waistband. The "in connection with" analysis is informed by safety-valve litigation, and, for purposes of safety valve eligibility, involves a "close connection linking the individual defendant, the weapon, and the offense." *United States v. Zavalza-Rodriguez*, 379 F.3d 1182, 1187 (10th Cir. 2004); see also *United States v. Carillo-Ayala*, 713 F.3d 82, 96 (11th Cir. 2013). Orgil committed his crimes not on the streets with violence but with vacuum packaging and USPS labels. Nothing in the aforementioned assertion should be taken as "downplaying" his actions. Selling drugs anywhere by any method is criminal conduct. However, the mere fact that the Defendant lived in a home with a gun owner should not preclude him from enjoying the relief the legislature intended. The Government cannot prove that the weapon was connected to defendant or the offense. There is no evidence that Mr. Orgil directed or advised his fiancé to own and keep the weapon in connection with the offense. The United States furnished the Defense with tens of thousands of photographs

taken from the Defendant's phone and from his fiancé's phone. Between thousands of images of new born babies and travel "selfies" there were also many photos of drugs and equipment for making drugs. The Government heavily relied on photos and messages in a previously seized phone to gain an indictment and a search warrant. The Government has not provided one photograph of Orgil using or possessing the Glock 19 in connection with the illegal conduct. Further, given Ms. Hoang's criminal conduct and conviction for same, it stands to reason that it is extremely probable that the firearm was hers. Orgil has also debriefed and assisted in his own prosecution in satisfaction of § 5C1.2(a)(5). Even if this Honorable Court finds that the Defendant "constructively" possessed the firearm, Orgil submits that the firearm was not "possessed in connection with the offense" and that under the standard of proof for the Safety Valve eligibility, the Government cannot prove that he possessed the gun in connection with the offense. If the Government could have proved that the firearm was used in connection or even remotely related to the indicted conduct, Orgil would have been charged under 18 U.S. Code § 924 (c)

Therefore, Defendant Orgil respectfully moves this Honorable Court to sentence him without regard to any statutory minimum sentence.

**Zero-Point Offender Amendment**

In November of 2023, the United States Sentencing Commission added new guidelines under Amendment 821. The Commission created an adjustment for "certain zero-point offenders." USSG §4C1.1. So long as certain enumerated conditions are satisfied, an offender with zero criminal history points is entitled to a 2 point reduction in offense level. Included in these conditions is that the defendant most not have possessed a firearm in connection with the offense. According to the Pre-sentence report provided by the Office of Probation, Tenzin is a zero-point

offender and should enjoy the protection the Commission has afforded to similarly situation offenders. The same standard for possession of a firearm stands when discussing the new amendments applicability. Orgil respectfully moves this Honorable Court to adopt the same ruling in the above argument that Defendant did NOT possess a firearm in connection with the offense and grant a 2 point reduction in offense level when considering a fair and sufficient sentence for Mr. Orgil.

## Motion for Downward Variance

Defendant Orgil respectfully moves this Honorable Court to grant a downward variance based on the 3553(a) factors. The Eleventh Circuit recognized that "[t]here are...many instances where the Guidelines range will not yield a reasonable sentence." *Hunt*, 459 F.3d at 1184 ("if *Booker* is to mean anything, it must be that district courts are obligated to impose a reasonable sentence, regardless of the Guidelines range, so long as the Guidelines have been considered."). The *Hunt* court also reasoned that a district court should consider factors such as: (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the need for the sentence imposed; (c) available sentencing; (d) type of sentencing and range established; (e) any pertinent sentencing commission policy statement; (f) a need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (g) the need to provide restitution to any victims of the offense. *Id*. Courts may also consider arguments that a guideline itself fails to properly reflect § 3553(a) considerations, reflects an unsound judgment, does not treat defendant's characteristics in the proper way, or that a different sentence is appropriate regardless. *Rita v. United States*, 551 U.S. 338, 351, 357 (2007); see also *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (finding that

judges "may vary from guideline ranges based solely on policy considerations, including disagreements with the guidelines.").

A sentencing judge should consider every convicted person as an individual and every case an unique study. *Koon v. United States*, 518 U.S. 81, 113 (1996). This ensures that the punishment fits the offender and not merely the crime. *Williams v. New York*, 337 U.S. 241, 247 (1949). Consideration of a defendant's life and characteristics is highly relevant, if not essential to an appropriate sentence. *Id.*, *see also United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007) (finding that under the post-*Booker* advisory guideline regime, district courts are not only permitted, but required to consider "the history and characteristics of the defendant.").

Mr. Orgil is 25 years old and was 21-23 years old during the course of the indicted conduct. In his Pre-sentence report, Officer Brantley devoted over two and a half pages to describe this young offender's unfortunate formative years and another almost two pages detailing his physical and mental health and substance abuse history. The undersigned believes this is relevant in fashioning an appropriate sentence because Mr. Orgil was only 24 years old when he took responsibility for the indicted crimes. We say only 24 years old because, according to the United States Sentencing Commission's "Sourcebook" FYE 2020, Table 7, only 15.9% of the 64,565 federal cases sentenced that year were under age 26.

While a district court is obligated to correctly apply and take the Guidelines into account, it is not constrained in any form or fashion from considering evidence when imposing a sentence. *Pepper v. United States*, 131 S. Ct. 1229, 1235 (2011) ("[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.") (*quoting Williams v. New York*, 337 U.S. 241, 246-247 (1940)). Although a sentencing court must consider a Guideline, it is free to exercise its

discretion in imposing a sentence it deems most appropriate. *United States v. Henry*, 1 F.4th 1315, 1322-23 (11th Cir. 2021). Similarly, a district court must consider all the § 3553(a) factors applicable to the defendant's case—but it is not required to give each factor equal weight. *United States v. Gillis*, 2021 WL 4817709 (October 15, 2021, 11th Cir. 2021) (citing *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015). "Indeed, 'the sentencing court is permitted to attach great weight to one factor over others.'" *Id*. But, "unjustified reliance on any one...factor is a symptom of an unreasonable sentence." *Gillis*, 2021 WL 4817709 at 1 (quoting *United States v. Crisp*, 454 F.3d 1285, 1292 (11th Cir. 2006); *see also United States v. McBride*, 511 F.3d 1293, 1297-98 (11th Cir. 2008) (noting that a district court has considerable discretion as to the weight it decides to give each of the § 3553(a) factors and disagreement with how the sentencing court weighs certain factors is insufficient to reverse a procedurally reasonable sentence). Mr. Orgil believes consideration of the sentencing factors described in 18 USC § 3553 are especially relevant in fashioning an appropriate sentence in this case because of Mr. Orgil's age, his life experiences, and where he is today. Lastly, this Honorable Court can and should consider the extreme hardships and collateral consequences Orgil has overcome.

This Honorable Court is asked to consider Mr. Orgil's acceptance of responsibility statement he will give at the sentencing hearing. This Honorable Court is asked to consider that Mr. Orgil's life is a life worth saving. Based on the factors and arguments above, Mr. Orgil respectfully requests this Honorable Court: 1) grant "Safety Valve" and "Zero-Point Offender" relief 2) impose a below-guidelines sentence and; 3) recommend the BOP designate him to an appropriate facility where he can continue his mental and physical health treatment as well as participate in RDAP while being as close as possible to his family in Northern California.

Undersigned Counsel and Mr. Orgil thank this Honorable Court for taking the time to consider the requests and arguments in aid of sentencing. Counsel and Mr. Orgil will have further remarks at the sentencing hearing.

**WHEREFORE**, Defendant prays this Honorable Court consider imposing a sentence below guidelines and recommend that the Federal Bureau of Prisons designate him to an appropriate facility close to his family.

Respectfully submitted,

The Law Offices of Richard L. Cooper, P.A.
14 NE 1st Avenue
Suite 300
Miami, FL 33132
(305) 799-0111
Email: RCooper@RichardLCooper.com

By: _____
Richard L. Cooper, Esquire
Florida Bar No. 92723

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was on this 10th day of May, 2023, furnished to all interested parties via the CF/ECF filing system.

_____
Richard L. Cooper, Esquire