UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-20018-CR-WILLIAMS

UNITED STATES OF AMERICA

vs.

TENZIN ORGIL,

      **Defendant.**

_____/

**GOVERNMENT'S REPONSE TO
DEFENDANT'S SENTENCING MEMORANDUM**

The United States of America, by and through the undersigned Assistant U.S. Attorney, respectfully submits this response to defendant Tenzin Orgil's sentencing memorandum [DE 66]. Although the defendant has styled his filing solely as a sentencing memorandum, it also functions as an untimely filed objections to the PSR.[1] Defense counsel raises two objections: application of the firearm enhancement/imposition of Safety Valve and non-application of the zero-point offender reduction. Both of these objections should be overruled.

Once these objections are resolved, the only remaining question is the appropriate sentence based on the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Howard*, 28 F.4th 180, 204-05 (11th Cir. 2022). Based on the PSR, the defendant's guidelines are life imprisonment. However, the government does not believe the defendant should be sentenced to life imprisonment. As detailed below, the government does believe a significant sentence is warranted in this case

    **I.**    **Objections to PSI**

        **A. Possession of a firearm (§2D1.1(b)(1)) and Safety Valve (§5C1.2)**

In paragraph 38 of the PSR, probation calculated the defendant's guidelines to include a 2-

---

[1] The draft PSR was disclosed on September 28, 2023. Objections were due by September 28, 2023.

level enhancement for possession of a firearm. The defendant argues that this enhancement should not apply. He then argues if it does not apply, the defendant would be eligible for Safety Valve pursuant to §5C1.2. Based on the defendant's constructive possession of a firearm in connection with this offense, probation has properly applied this enhancement and the defendant is not eligible for Safety Valve.

Below (labeled Image 1) is a picture of the firearm at issue. As a preliminary matter, this firearm is not a Glock 19 as the defendant alleges. This gun has two components. First, there is the Glock slide with a serial number. Second, there is the P80 frame. The P80 lowers are designed to conform with all Glock components so you can use factory components for everything but the lower frame with the trigger in it, which is the P80 kit. There is no serial number on this frame. As to the defendant's claim that the government should be able to trace the gun, that is not possible. The only number on this gun was the serial number Glock assigned to the slide. Unless the slide is sold with the corresponding lower (Glock frame), it would not be registered anywhere. That component could have been purchased by itself or taken from a gun purchased in a state where they do not register firearms upon sale. For this gun, which is Glock slide on a P80 frame, there is no record of who owned it. These types of firearms are referred to as ghost guns because they are untraceable. Most responsible gun owners do not have these types of ghost guns - they are predominately used by criminals as the gun cannot be traced back to them. This is not the first time the defendant has possessed an unregistered firearm either. On September 18, 2020, when stopped by police regarding a robbery, the defendant was in possession of an unregistered Glock 43. *See* PSR ¶ 50 (1st paragraph).

The defendant also argues the gun belongs his fiancée, not him. First, he argues that a

Glock 19 is very small and made for a woman's hands. As previously discussed, this is not a Glock 19. Further, by simply looking at the gun in Image 1, in comparison to the items on the counter, one can clearly see that this is an average size gun and there is nothing petite about it. The second argument is more speculative. The defendant seems to imply that his fiancée, who is serving a sentence of 60 days imprisonment for a conviction of aggravated assault in California, may have used this specific firearm in the assault. [DE 66 at 7]. This is wild speculation and, moreover, factually incorrect. The fiancée was convicted of using a pepper spray gun in the vicious assault of multiple victims, not a firearm. The defendant was her accomplice in that crime. *See* PSR, ¶ 54. There is no evidence that the fiancée ever possessed the gun found in the search and certainly no evidence that she used it during the aggravated assault. Further, it is the defendant who has a history of possessing and using guns in the commission of crimes. *See* PSR ¶ 50.

      The defendant further argues that this enhancement is, "meant for those who use the firearm as a means to protect their illegal activities and to possibly hurt those who threaten the stability of the same" [DE 66, pg.8]. That is exactly why this enhancement applies. The defendant, who kept large sums of drug proceeds in his home, where he ran his business from, had the firearm for protection because of his drug trafficking. While there were no drugs found in the defendant's house, his computer (base of operations for dark web activity and access to cryptocurrency wallets), recipes for methamphetamine manufacture, fake IDs, and most importantly, a money counter, with thousands of dollars in cash in and near the money counter were all found within just a few feet of his firearm. The proximity of the gun to the money counter is explained by looking at the series of photos below.[2]

---

[2] All the items pictured below were found in these exact locations upon entry to the defendant's home.



IMAGE 1: The firearm and loaded magazine found on defendant's counter pursuant to search warrant.



IMAGE 2: The yellow circle identifies location of the gun as seen in Image 1. As shown in Image 3 below, the money counter was found on the other side of the column identified by the blue arrow.



IMAGE 3: The yellow circle identifies a prong on the money counter as seen in Image 4 below.

4



IMAGE 4: Money counter with cash in it, and a stack of cash beside it, approximately five feet away from firearm.

"The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. §2D1.1(b)(1) cmt. n.11(A). The defendant argues that the most common scenario for this enhancement is when a defendant has large amounts of drugs in his possession and at the same time there is a gun in his waistband [DE 66 at 8]. Unlike what the defendant argues, the defendant does not need to actually possess the firearm nor do drugs need to be present near the firearm for this enhancement to apply. In *United States v. Hall*, 46 F.3d 62, 63–64 (11th Cir. 1995), the Eleventh Circuit upheld the application of the §2D1.1(b)(1) enhancement in a case where the defendant was charged with drug trafficking crimes, and a gun, which was constructively possessed by the defendant, was found in a search of a location, but there were no drugs found. In that case, the firearm at issue was found in the same room as several drug-related objects, including a set of scales, a ziplock bag with cocaine residue, and a large amount of cash. *Id*. In an even more analogous case, the Eleventh Circuit upheld the application of the firearm enhancement in a drug trafficking case when during a search no drugs were found nor did any drug trafficking activity even occur at the residence, but a firearm that could have been used to protect drug proceeds was found in the same residence as a

5

money counter. *United States v. Jones*, 657 Fed.Appx. 938, 947-948 (11th Cir. 2016). ("The firearm was found in the same residence as a money counter, an item commonly associated with drug trafficking operations, and the BMW containing more than $270,000 in drug proceeds.") In the instant case, the firearm was found approximately five feet from the money counter and cash, which was all proceeds of drug trafficking. This enhancement clearly applies.

Finally, application of the §2D1.1(b)(1) enhancement does not necessarily preclude application of §5C1.2 (Safety Valve). That guideline requires, among other things, that the "defendant did not . . . possess a firearm or other dangerous weapon." *See* §5C1.2(a)(2). That is because §2D1.1(b)(1) and §5C1.2 have different parameters. For ineligibility for Safety Valve based on possession of a firearm, the defendant, and not another person, must possess the weapon and there is a different burden of proof, the connection to the offense must be proved by a preponderance of the evidence. As to these two requirements, the defendant was the constructive possessor of the firearm and the government has shown by a preponderance of the evidence that there is a connection between the firearm and the drug trafficking and money laundering offenses. The defendant is ineligible for Safety Valve and this objection should be overruled.

### B.  Adjustment for Certain Zero Point Offenders (§4C1.1)

The defendant next argues that he is entitled to a two-level reduction pursuant to §4C1.1, as he has zero criminal history points. The defendant is not eligible for this reduction. As reflected in paragraph 50 of the PSI, the defendant has 1 criminal history point for the very brutal robbery he committed, and pled guilty to, on May 10, 2022, in San Jose, California. In the PSR paragraph 51, probation erroneously stated that the defendant is a zero-point offender. I have spoken to USPO Brantley and she has confirmed the defendant does in fact have 1 criminal history point and

paragraph 51 represents a scrivener's error. She will be filing an addendum to the PSR prior to sentencing to correct the error. Therefore, the defendant is not eligible for a reduction as a zero-point offender.[3]

## II. Legal Framework

Once the guidelines are calculated, the district court must impose a sentence after considering the advisory range and the factors set forth in 18 U.S.C. § 3553(a). *Id.* "The district court's task is to impose a sentence that will adequately (1) reflect the seriousness of the offense, (2) promote respect for the law, (3) provide just punishment, (4) afford adequate deterrence, (5) protect the public from further crimes of the defendant, and (6) provide the defendant with any needed training and treatment in the most effective manner." *Id.* (citations and internal quotations omitted). "The task is a holistic endeavor that requires the district court to consider a variety of factors: (1) the nature and circumstances of the offense, (2) the defendant's history and characteristics, (3) the kinds of sentences available, (4) the applicable sentencing guidelines range, (5) pertinent policy statements of the Sentencing Commission, (6) the need to provide restitution to any victims, and (7) the need to avoid unwarranted sentencing disparities." *Id.* (citations and internal quotations omitted).

### A. The Seriousness of Offense and the Need to Promote Respect for the Law and Provide Just Punishment

In this case, the amount of narcotics attributed to the defendant is 4.965 kilograms of pure methamphetamine and 2.54 grams of fentanyl. This amount is a small representation of the defendant's large drug trafficking enterprise. However, with these amounts alone, this is a serious

---

[3] Unless the defendant prevails in his argument relating to the firearm enhancement, he is also not eligible for the zero-point offender reduction based on possession of the firearm.

drug offense involving a huge quantity of illegal narcotics, including 100% pure methamphetamine, which had to come directly from a lab, and fentanyl disguised as oxycodone pills. These counterfeit oxycodone pills, sold by not only the defendant but many other drug traffickers, are a problem throughout the U.S. and have led to innumerable overdose deaths. His money laundering was prolific and sophisticated. Millions of dollars in cryptocurrency passed through accounts he controlled. He likely has huge amounts of cryptocurrency hidden in wallets that the government has not been able to identify. To be clear, he has also not identified these wallets for the government, nor has he forfeited any of his ill-gotten gains.

      The defendant operated in almost total anonymity on the dark web. Further, the defendant had a vast drug manufacturing enterprise where he set up clandestine laboratories for the manufacturing of illicit narcotics, such as methamphetamine and MDMA. He culled the internet for recipes, like the one found on his kitchen counter. He got MDMA and methamphetamine precursor chemicals from specialized Chinese chemical companies. The defendant then set up and operated these laboratories with his co-conspirators. All this is confirmed by not only the stop by the Irvine Police Department where the defendant was found in possession of precursor chemicals from China to make MDMA, but also evidence found in the defendant's phone, such as photos of the labs and screenshots of conversations with co-conspirators regarding the manufacture of illicit narcotics [DE 52, Pg. 3-4]. See photo and screenshots below.







Moreover, the crime at issue continued for almost three years and evolved over time. The defendant got better at obscuring his identity, concealing his proceeds, and creating a more refined product at his clandestine laboratories. Notably, even after the defendant pled guilty in his robbery case in San Jose in early 2022, and he was placed on an ankle monitor, he continued selling drugs on the dark web and manufacturing drugs in his clandestine laboratories while reaping in the proceeds, most of which he then quickly concealed away. In fact, it appears that the only reason this crime stopped was because the defendant was arrested in the instant case and detained, so he physically could not sell or manufacture drugs anymore.

In sum, a serious offense like this demands a serious sentence, one that will promote respect for laws designed to protect the public from this dangerous distribution of homemade and powerful drugs and justly punish those who illicitly gain from this type of offense.

**B. The Need to Promote General Deterrence and Protect Public from Further Crimes of the Defendant.**

Deterrence is another factor supporting a significant sentence. "[G]eneral deterrence is one of the key purposes of sentencing." *United States v. McQueen*, 727 F.3d 1144, 1158 (11th Cir. 2013). A serious sentence here will serve as a much-needed severe warning to other drug traffickers who think they can hide in obscurity on the dark net while poisoning Americans with deadly drugs.

Further, there is a need here to protect the public from future crimes of the defendant. As stated above, the drugs he sold were some of the most detrimental and deadly available to human beings. There is also the fact that he was manufacturing methamphetamine and MDMA in locations not intended to be drug labs. These types of clandestine labs are dangerous in and of

themselves. Even a guilty plea and ankle monitor did not prevent the defendant from continuing to commit these crimes. He was relentless in continuing his illicit activities and there is no reason to believe that will change if he is sentenced to a short term of imprisonment. A significant sentence is required to protect the public.

### C. Defendant's History and Characteristics

Defendant's history and characteristics cut both ways. One the one hand, Defendant is intelligent and has a supportive family. *See* PSR ¶¶ 56-61 (describing his immediate family); DE 66 (letters of support from friends and family). It is clear from the high level of intelligence and skill that was required to conduct the drug trafficking and money laundering in this case, that his supporters are correct when they say things such as, "his intelligence and ability to grasp information, especially technical is far advanced, and thus, he is gifted" [DE 66, pg. 25]. Ordinarily, these are positive traits that one can be proud of. But in the context of someone who uses that intelligence and advanced technical skill to commit serious, long-running drug trafficking and money laundering offenses, these characteristics undermine the argument for leniency. Defendant was not forced into crime through a want of opportunities in life. Nor can it be said that his conduct was simply a momentary lapse in judgement. His involvement in this multi-year drug trafficking enterprise was not aberrant behavior, as that term is ordinarily used. Rather, his criminal conduct became his profession and his way of life. He chose to enrich himself the easy way, through robberies and drug trafficking, instead of using his intelligence and skill to sustain himself legally. Moreover, the defendant did not voluntarily cease his criminal conduct through some moral epiphany or change of heart, but rather due to the fact he was arrested and was forced to stop.

11

In the letters of support submitted on the defendant's behalf, his friends and family use many similar words and phrases to describe him. They say he is, "a good man to society," "a kind and good man…who has a heart of gold," and "respects the lives of other people." [DE 66, pg. 25, 20, 21]. These supporters clearly do not know the full breadth of the defendant's crimes. He sold some of the most potent and deadly drugs available and sent them to people all over the U.S. He sold these drugs without care or concern about the deadly effects and potential for overdose. He also had violent way of life; he brutally robbed people of their money and attacked victims with pepper spray. These actions show that the defendant had no respect for people's lives nor were they the actions of kind, good man.

### D. A Variance is Warranted.

Notwithstanding the points outlined above that strongly favor a guideline sentence of life imprisonment, the government does not believe this Court should sentence the defendant to that. The defendant's actions, while egregious, do not mean he is completely unredeemable. The imposition of a life sentence in this case would be greater than necessary to adequately address all the factors set forth in 18 U.S.C. § 3553(a). However, these facts and circumstances do require that a significant sentence be imposed on the defendant and that is exactly what this Court should do. The government will make a specific sentencing recommendation at the sentencing hearing.

(This space intentionally left blank.)

### III.     Conclusion

For the foregoing reasons, the Government respectfully requests that the Court overrule the defendant's objections, adopt the PSR as drafted, grant Defendant a downward variance from the guideline range of life imprisonment, and impose a significant sentence that reflects the seriousness of this offense.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   *s/ Monique Botero*
Monique Botero
Assistant United States Attorney
Florida Bar No. 722286
U.S. Attorney's Office - SDFL
99 N.E. 4th Street
Miami, FL 33132
Telephone: (305) 961-9010
Email: Monique.Botero@usdoj.gov